1

2

3

4 **UNITED STATES DISTRICT COURT**

5 **DISTRICT OF NEVADA**

6 * * *

7  AMANDA MATTHEWS; JAMES IIAMS,          Case No. 2:18-cv-00231-RFB-DJA

8          Plaintiff(s),                            **ORDER**

9      v.

10 LAS VEGAS METROPOLITAN POLICE
   DEPARTMENT; JUSTIN BRYERS;
11 RICHARD NELSON; JONATHAN
   CARRINGTON; LUKAS FERRIS,
12
          Defendant(s).
13

14      **I.      INTRODUCTION**

15          Before the Court are Defendant Las Vegas Metropolitan Police Department's ("LVMPD"
16
   or "Metro") Motion for Summary Judgment, Defendants Justin Bryers, Jonathan Carrington,
17
   Lukas Ferris, and Richard Nelson's (collectively "the Officers") Motion for Summary Judgment,
18
19 and Plaintiff James Iiams' ("Iiams") Motion for Partial Summary Judgment. ECF Nos. 47 – 49.

20
   **II.      PROCEDURAL BACKGROUND**
21
22      Plaintiffs filed their first complaint on February 7, 2018. ECF No. 1. Defendants moved

23 to dismiss the complaint on March 8, 2018. ECF No. 12. Plaintiffs moved to file an amended

24 complaint that was then filed on July 2, 2018. ECF Nos. 20–22. Defendants answered the
25
   complaint on July 16, 2018. ECF No. 36. The Court granted a stipulation to withdraw LVMPD's
26
27 motion to dismiss on January 17, 2019. ECF No. 41. The Court granted a stipulation of dismissal

28 as to Plaintiff Amanda Matthews on April 5, 2019. ECF No. 46. Defendant LVMPD moved for

summary judgment on May 2, 2019. ECF No. 47. A response and reply were filed. ECF Nos. 54, 57, 60. The Officers also moved for summary judgment on that day. ECF No. 48.  A response and reply were filed. ECF Nos. 55, 56, 59. Plaintiff moved for partial summary judgment on May 2, 2019. ECF No. 49. The Court heard oral argument on the motions on March 10, 2020. ECF No. 67. This written order now follows.

### III.    FACTUAL BACKGROUND

The Court makes the following findings of disputed and undisputed facts:

#### a.  Undisputed Facts

The Court finds the following facts to be undisputed. On April 1, 2017, at around 8:30pm, Plaintiff James Iiams was traveling as a passenger in a van with approximately 15 people, heading towards a "Mongols" motorcycling event. The Mongols are a motorcycle club, that has been alleged to be a "motorcycle gang" associated with criminal activity by LVMPD—the negative connotation of which is disputed by Plaintiff. The driver of the van was Ronnie Acosta. Officer Richard Nelson was on patrol with Officer Enrique Romano.  Officer Nelson pulled the van over because it was being operated with no headlights in violation of Nevada law. The patrol vehicle of the officers pulled in behind the van after it pulled into a parking lot. The van was thus blocked in the lot by the police vehicle. After pulling over the van, Officer Nelson approached the driver's side of the van while Officer Romano approached the passenger side of the van.

Officer Nelson asked the driver to produce his driver's license and registration. Officer Nelson then addressed the passengers in the van and asked the passengers whether they had "ID" on them. Officer Nelson then stated "All right. Start—start moving them up. IDs up front." Officer Nelson asked another officer to inform LVMPD that there were 15 people in the van and to request backup.

After hearing and responding to Officer Nelson's call for backup, Sergeant Justin Byers and Officers Johnathan Carrington, Travis Humphreys and Lukas Ferris also arrived to assist with the stop. The passengers in the van complied with Officer Nelson's direction to surrender their IDs.

After acquiring the IDs, Officer Nelson distributed them amongst the other officers who had arrived at the stop and asked them to check the various IDs. The officers were instructed to "go ahead and triple-I them"—referring to the drivers' licenses. "Triple-I" refers to the Interstate Identification Index, a database that reveals the arrest history of a person in jurisdictions outside Nevada. Officer Humphreys and Officer Ferris had a conversation in which it was confirmed that the IDs would be run through "triple-I" and "local" databases. Officer Nelson then began to fill out a field interview ("FI") card on the driver. A field interview involves more questions than simply those about the driver's basic information which would be necessary for a routine traffic stop which this was.

All 15 IDs were checked in police databases. The police found no outstanding warrants as to James Iiams or any of the other passengers. However, the search results for Iiams did reveal prior convictions for assault and battery in Arizona and California. The officer who checked Iiams' ID informed Officer Nelson of the results of his check of Iiams' ID. About 15-17 minutes into the stop, Nelson instructed the driver of the van to exit the vehicle. Officer Nelson instructed Officer Carrington to perform a field investigation of James Iiams. Officer Carrington was assisted with this interview by Officer Ferris.

Immediately after Iiams surrendered his ID he called his attorney, Stephen Stubbs, who eventually arrived on the scene about 5-10 minutes after being called. Officer Nelson only started asking questions of the driver in preparation to issue a citation after Stubbs arrived on the scene.

1
2
3
4
5

Officer Nelson could have been asking these questions from the moment the stop was initiated but did not begin to do so until approximately 15-20 minutes after the stop had been initiated. He then asked the driver about car insurance for the vehicle and eventually issued a traffic citation to the driver and allowed him to return to the van.

6
7
8
9
10
11
12
13
14
15
16

As noted, approximately 15-18 minutes into the stop, Officer Carrington approached the van and said, "James, go ahead and step out and go over here, we need to talk to you for a second." Officer Carrington and Officer Ferris then began a field interview of Iiams. First, Officer Carrington asked Iiams whether he had any weapons on him. Iiams stated that he had a knife on him. Officer Carrington proceeded to give Iiams a patdown and held unto the knife until the stop was completed. Officer Carrington informed Iiams that he was not under arrest and would not be handcuffed. At the point that Iiams was told to exit the van, around 15-18 minutes had passed, and Acosta's citation had not been written up. Shortly after the patdown is when Iiams noticed his attorney Stubbs approaching and said: "That's my lawyer right there."

17
18
19
20
21
22

Officers Carrington and Ferris continued with their questioning of Iiams. Carrington asked Iiams if he had any monikers, nicknames, or anything of that nature. Second Carrington asked Iiams to verify his address. Third, Ferris asked if Iiams and his group were in Las Vegas for the weekend. Fourth, Carrington asked who Iiams was riding with—a reference to what motorcycle group he was traveling with. Finally, Officer Carrington asked Iiams what tattoos he had.

23
24
25
26
27
28

After Iiams was asked "who he was riding with," Iiams asked for clarification as to what was going on. Officer Ferris informed him that, "Everybody's getting it," while Officer Carrington remarked that they were "trying to keep track of who's coming in and out." Iiams asked that his ID be returned to him toward the end of the interview. Officer Carrington refused to provide it. Officer Carrington stated that Iiams could have it back when Carrington had finished the field

4

interview. Less than two minutes after Carrington had refused to return Iams' ID, Byers ordered Carrington to return the ID, which Carrington did.

After passenger IDs had been run and Iiams had been identified as the subject of a field interview, Officer Nelson began to perform a field interview of Acosta and Acosta was cited. After the interview with Officer Carrington, Iiams was permitted to return to the van. The entire stop lasted approximately 35 minutes. It took approximately 18 minutes to run the 14 licenses of the passengers.

At no point during the traffic stop did any of the officers observe Iiams commit a crime or observe evidence of a recently committed or soon to be committed crime by him or any other occupants of the vehicle—other than the traffic violation. That is to say, the officers never had any reasonable suspicion that the passengers of the van had committed, were committing, or were about to commit a crime. And, at no point during the stop did the officers observe any behavior that would indicate a threat to their safety or the safety of the public. At all times, the occupants of the van were completely compliant with the directions of the officers.

### b. Disputed Facts

The parties do dispute the length of time by which the stop was extended by checking the identification of the passengers of the vehicle. The parties also dispute to what extent the field interview of Iiams extended or did not extend the traffic stop.

### IV.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322(1986).

When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. <u>Gonzalez v. City of Anaheim</u>, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. <u>Zetwick v. Cty. of Yolo</u>, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

## V.      DISCUSSION

The Court will address the application of each of the motions for summary judgment to the claims asserted by the Plaintiff. The Plaintiff has asserted various theories of liability against the various defendants. In his first claim, Plaintiff asserts that all the individual Defendants unlawfully extended the traffic stop resulting in him being unlawfully detained. In his second claim, Plaintiff alleges that Defendant Nelson violated his rights by demanding that Plaintiff identify himself and provide documentation of his identity. In his fourth claim, Plaintiff alleges that LVMPD has a de facto policy of unlawfully extending traffic stops and demanding written identification from passengers in vehicles.[1]

---

[1] In his Amended Complaint, Plaintiff appears to assert as his third claim against "Doe Officers" that Officer Nelson violated his constitutional rights by subjecting him to an unlawful search or seizure. The Court construes this claim as part of his claim under Claim One against Officer Nelson that the stop of Plaintiff was unlawfully extended. The Court thus finds that theories of liability in the First and Third Claims merge and will consider them as one claim for relief under

6

1

### a. First Claim – Unlawful Extension of Traffic Stop

The Court finds, based upon the undisputed facts, that the officers unlawfully extended the traffic stop by checking the ID's for all the passengers of the vehicle when they did not have reasonable suspicion as to any of them and when there was no other reason related to the traffic stop that justified the checking of these ID's. The checking of the ID's unlawfully extended the stop at least 15 minutes or more simply to gather information about the occupants of the van. This was unlawful.

### i. The Traffic Stop

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015). A "routine traffic stop" is more analogous to a "Terry stop" than a formal arrest. Id. (internal citations omitted). "Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop" and address "related safety concerns." Id. (internal citations omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." Id. (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. (internal citations omitted).

The Fourth Amendment does tolerate certain unrelated investigations during a traffic stop so long as they do "not lengthen the roadside detention." Arizona v. Johnson, 555 U.S. 323, 327-28 (2009). The seizure remains lawful "so long as [unrelated] inquiries do not measurably extend the duration of the stop." Id. at 333.

_____

Claim One. The Third Claim is therefore dismissed as duplicative.

7

The Court finds that the undisputed facts establish that the traffic stop was unlawfully extended by the officers when they decided to collect and run background checks on all the passengers of the vehicle. While the parties dispute the length by which the stop was disputed, the Court finds that it is undisputed that the traffic stop was extended by at least 15-20 minutes by the checking of the ID's for all the passengers in the van. The record, including body camera footage, undisputedly establishes that the initial 15 minutes of the stop were not spent investigating the traffic stop. Rather, the officers were checking the ID's of the van occupants.

The individual Defendants inexplicably argue that officers checking of the ID's did not unlawfully extend the stop. First, this argument is actually belied by the timeline that the Defendants themselves submitted in connection with their motion for summary judgment. This is evidenced in the following excerpt:



Excerpt A from ECF No. 48 at 19.

8

The Defendants' own timeline confirms that that running of the ID's took at least 18 minutes and, most importantly, for the first 15 minutes of the stop, the focus of the officers was running the ID's of the passengers and not asking questions of the driver regarding the traffic stop. This is consistent with the Court's finding on the undisputed facts. The Court finds that the record establishes that it is undisputed that the checking of the ID's extended the traffic stop by at least 15 minutes if not more.

Second, the Court also finds it to be undisputed that the officers did not have reasonable suspicion that any of the occupants of the van, including Iiams, had committed or were about to commit any crime—other than the traffic violation by the driver regarding headlights. The Court also finds that the occupants did not engage in any conduct or behavior that suggested that they were a threat to the safety of the officers on the scene. The occupants were fully compliant with the instructions of the officers. Indeed, the Court finds that it is undisputed that their tone was amiable in dealing with the officers.

Third, the Defendants also argue that the running of these ID's was necessary for the safety of the officers on the scene, since the occupants of van appeared to be members of a "motorcycle gang"—the Mongols. The Defendants appear to be relying upon that portion of the Supreme Court's opinion in Rodriguez when the Court noted that an officer "may need to take certain negligibly burdensome precautions in order to complete his mission safely." 575 U.S. at 356. This argument is misplaced. The Supreme Court explained in Rodriguez that "an officer's mission includes 'ordinary inquiries incident to the traffic stop . . . including checking the *driver*'s license, determining whether there are outstanding warrants against the *driver*, and inspecting the automobile's registration and proof of insurance." Id. at 355 (emphasis added). Such inquiries, the Supreme Court found, "serve the same objective as enforcement of the traffic code: ensuring that

vehicles on the road are operated safely and responsibly." Id. The running of these ID's was unrelated to the mission of the traffic stop as required under Rodriguez. Id. at 357-58.

Moreover, the checking of the ID's did not enhance the safety or security of the officers on the scene. As the Court has found, the occupants did not exhibit any threatening behavior or making any threatening or aggressive statements. Quite the contrary, it is undisputed that the occupants had an amiable approach to the officers and even joked with them at times. As the Ninth Circuit concluded in United States v. Evans, 786 F. 779 (9th Cir. 2015), the checking of ID's for other information and possibly other crimes does *not* enhance "officer safety." Id. at 787. This Court agrees with the Ninth Circuit in Evans when it found that such investigatory checks are in fact "inversely related to officer safety" as these checks extend the stop beyond its natural duration and thus expose the officers to greater risk. Id. That is precisely what happened here. Rather than completing a simple traffic stop related to a headlight violation that would have taken approximately 10-15 minutes the officers' decision to check the ID's more than doubled the time of the stop as occurred in Evans. Id. The Court finds that the checking of the passengers' ID's in this case cannot be justified by officer safety. The Court thus finds that the officers' checking of the passenger ID's unlawfully extended the traffic stop in this case.

The Court now turns to the individual liability of the respective defendants.

### ii. Individual Liability For Unlawfully Extending the Stop

The Court finds Defendants Nelson and Ferris are liable and not entitled to qualified immunity. The Court further finds that Defendants Byers and Carrington shall proceed to trial on this claim and are not entitled to qualified immunity.

An individual can be held liable pursuant to § 1983 only when there is "a showing of personal participation in the alleged rights deprivation." Jones v. Williams, 297 F.3d 930, 934 (9th

Cir. 2002). Under the integral participant theory, an individual's personal participation can be established through "some fundamental involvement in the conduct that allegedly caused the violation." Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007). In the absence of direct personal participation in the ultimate act of deprivation, Section 1983 liability exists when an individual "set[s] in motion a series of acts by others which the [individual] knows or reasonably should know would cause others to inflict the constitutional injury." Arnold v. Int'l Bus. Machs. Corp., 637 F.2d 1350, 1355 (9th Cir. 1981) (internal citations omitted).

Qualified immunity is an immunity from suit rather than a defense to liability, and "ensures that officers are on notice their conduct is unlawful before being subjected to suit." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014). In deciding whether officers are entitled to qualified immunity, courts consider, taking the facts in the light most favorable to the nonmoving party, whether (1) the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at the time. Id. Under the second prong, courts "consider whether a reasonable officer would have had fair notice that the action was unlawful." Id. at 1125 (internal quotation marks omitted). While a case directly on point is not required in order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). This ensures that the law has given officials "fair warning that their conduct is unconstitutional." Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir. 2013) (internal citation omitted).

### 1. Officer Nelson

The Court finds that Officer Nelson is liable on Claim One for unlawfully extending the traffic stop in which Iiams was a passenger and that he is not entitled to qualified immunity.

First, the Court finds that Nelson personally participated in the unlawful extension of the traffic stop. He directed passengers in the van to provide ID's to check even though there was no reasonable suspicion that any passenger, including Iiams, had committed, was committing or would commit a crime. He was not under threat from the passengers. The traffic stop, he knew, did not involve the passengers. In short, he directed the passengers to provide their ID's so he could conduct background checks on them unrelated to the traffic stop. The admitted intent of these checks was to gather information on the identity of individuals at the Mongols' event. The checking of these ID's essentially doubled the length of the traffic stop. The Court further finds that it is undisputed that Nelson knew that the stop was being extended. This was an unlawful extension of the traffic stop. Rodriguez, 575 U.S. at 356.

In 2017, it would have been beyond debate that prolongation of a traffic stop to pursue investigative activities unrelated to the traffic stop that measurably extended the duration of the stop was unconstitutional, as established by Rodriguez, Evans, and Arizona. The undisputed facts establish that the officers here doubled the length of the stop to check the ID's of the van's passengers without reasonable suspicion and without the investigation being related in any way to the traffic stop. With respect to Nelson specifically, the Court finds it undisputed that he directly and knowingly participated in unlawfully extending the detention of Iiams by ordering the passengers of the van to provide their ID's and then directing other officers to check these ID's when these checks were unrelated to the mission of the stop and by asking questions during the field interview of Acosta that were also unrelated to the mission of the stop. The extension of the stop for these unrelated investigations violated clearly established law. Accordingly, qualified immunity does not apply Nelson's unlawful conduct.

The Court finds the Defendants' attempt to rely on <u>United States v. Diaz-Castenada</u>, 494 F.3d 1146 (9th Cir. 2007) to be inapposite. First, that case was decided before <u>Rodriguez</u> and then <u>Evans</u> which both clearly establish prior to the stop in this case that *any* investigation unrelated to the mission of the traffic stop which extends the stop is unconstitutional. <u>Rodriguez</u>, 575 U.S. at 354-55; <u>Evans</u>, 786 F.3d at 787. Second, <u>Diaz-Casteneda</u> is distinguishable in that the officer requested and checked the passenger's identification, because the driver had been arrested for a suspended license and the officer wanted to confirm that the passenger, Diaz-Castenada had a valid driver's license. 494 F.3d at 1149 (explaining that the reason the officer checked the passenger's identification was "so [the passenger] could take the vehicle so we didn't have to tow it"). This case is thus unavailing for Nelson on this claim.

Summary judgment is granted against Nelson on this claim. This claim shall proceed to trial solely for the purpose of determining damages.

### 2. Officer Ferris

The Court finds that Officer Ferris liable as to Claim One and that he is not entitled to qualified immunity.

The Court finds that Ferris personally participated in running the ID's of the passengers in the van and this ID check unlawfully extended the traffic stop during which Iiams was detained. Ferris knew that this was a traffic stop yet he ran ID checks through the Triple I database and local databases. He knew the checking was unrelated to the stop. Indeed, he told Iiams that the reasons for the detention and questions was to "keep track of who is coming in and out" of the gathering. Ferris is therefore liable for his unlawful conduct that extended the stop.[2]

---

[2] The Court's finding of liability against Ferris is not based upon his participation in the questioning of Iiams as the Court has found it to be a disputed fact as to whether or not this interview extended the stop beyond its traffic mission.

13

The Court further finds that Ferris is not entitled to qualified immunity. Based upon the undisputed facts, Ferris participated in law enforcement conduct that unlawfully extended a routine traffic stop. As previously noted, this violated clearly established law by the Supreme Court in Rodriguez. 575 U.S. at 354 (explaining that conduct which extends traffic stop beyond its purpose represents a Fourth Amendment violation).

The Court therefore grants summary judgment in Plaintiff's favor against Officer Ferris. This claim shall proceed trial solely for the purpose of determining damages.

### 3.   Officer Carrington

The Court denies summary judgment on all motions as to Officer Carrington and orders this claim to proceed to trial as there are genuine issues of disputed fact. The Court finds that Carrington is not entitled to qualified immunity.

The Court finds that there are genuine issues of disputed fact as to whether Carrington's conduct unlawfully extended the traffic stop. It is undisputed that Carrington was not involved in the checking of ID's but he was involved with the field interview of Iiams. The Court finds that about 16 minutes into the traffic stop, Nelson directed Carrington to conduct a field interview of Iiams. It is also undisputed that Carrington's interview was completely unrelated to the traffic stop of Acosta and that Carrington knew this. It is undisputed that Carrington participated in the interview of Iiams where Iiams was questioned about a.) any nicknames or monikers, b.) his current address, c.) whether Iams' 'group' was in Las Vegas for the weekend, d.) who Iiams was 'riding' with, and e.) any tattoos that Iiams had. It is a disputed fact whether the field interview in which Carrington participated extended the traffic stop beyond its mission. Thus, this claim shall proceed to trial.

The Court also finds for the same reasons previously enumerated that Carrington is not entitled to qualified immunity. Construing the facts in the Plaintiff's favor, Carrington conducted a field interview of Iams that was unrelated to the traffic stop and that extended the traffic stop beyond its mission. This would be a violation of clearly established law. Id.

### 4. Sergeant Byers

The Court will also allow the claim to proceed against Sergeant Byers under a supervisor liability theory. "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" Starr v. Baca, 652 F.3d 1202, 1208 (9th Cir. 2011) (internal citations omitted). Sergeant Byers arrived after the stop had already begun. Byers did not order any of the officers to conduct check of the ID's as that process had started before he arrived. Byers did authorize or sanction the field interview of Iiams. However, there is a dispute as to whether or not Byers knew that there was no reasonable suspicion that any of the passengers, Iiams, had committed any crime. There is also a dispute whether the interview extended the traffic stop and whether he knew that it was extending the traffic stop without reasonable suspicion of criminal activity. As there are genuine issues of disputed fact as to whether Byers' conduct and supervision contributed to the unlawful extension of the traffic stop, summary judgment is denied.

The Court also finds that Byers is not entitled to qualified immunity. Construing the facts in the Plaintiff's favor, Byers authorized a field interview that was unrelated to the mission of the traffic stop and that unlawfully extended the traffic stop. This would have been a violation of clearly established law. Rodriguez. 575 U.S. at 354. Qualified immunity does not thus apply to

this claim with respect to Byers. Accordingly, the Court shall also allow this claim to proceed against Sergeant Byers.

### b.  Second Claim -- Officer Nelson and the Alleged Demand For ID's

In his Second Claim, Plaintiff alleges that Defendant Nelson violated his constitutional rights simply by demanding his identification (and the other passengers) and detaining him by holding his identification. The Court also grants summary judgment against Nelson on this claim.

Section 171.123 of the Nevada Revised Statutes provides police officers with a required protocol they are to follow when temporarily detaining someone. Specifically, the law forbids police officers from detaining a person for no longer than sixty minutes and authorizes officers to detain a person to ascertain the person's identity. Nev. Rev. Stat. § 171.123. Under the law, a person so detained must identify themselves, but cannot be compelled to answer any other inquiry. Nev. Rev. Stat. § 171.123(3). In 2004, the Supreme Court addressed an as-applied constitutionality challenge of NRS 117.123(3). Hiibel v. Sixth Judicial District Court of Nev., 542 U.S. 177 (2004). In Hiibel, a police officer received a report of an assault in a red and silver truck. Id.  Upon reaching the vehicle, which was now parked on the side of the road, the officer asked a man (Hiibel) beside the vehicle if he had "any identification on him." Id. at 181. The officer asked for identification 11 times and the man refused to provide any identification. Hiibel was then charged with willful obstruction of an officer's duties. Id. Hiibel argued that the conviction violated his Fifth Amendment right against self-incrimination. The Supreme Court disagreed, finding that although a request for one's identity is by its nature testimonial, "[a]nswering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances." Id. at 191. The Supreme Court also noted that the statute, relying on the Nevada Supreme Court's understanding of its requirements, "does *not* require a suspect to give the officer

16

a driver's license or any other document," and that "[p]rovided that the suspect either states his name or communicates it to the officer by other means . . . the statute is satisfied and no violation occurs." Id. at 185 (emphasis added).

The focus on Hiibel by the parties here, however, is misplaced because the relevant and controlling precedent for this case was issued over 30 years ago. Well before Hiibel, the United States Supreme Court held in Brown v. Texas that an officer could not require an individual to provide any documentary form of identification unless the officer had reasonable suspicion of criminal conduct. 443 U.S. 47, 52-53 (1979). That the Supreme Court in Brown clearly set for the relevant precedent for this case was confirmed recently by the Ninth Circuit in United States v. Landeros, 913 F.3d 862 (9th Cir. 2019) when it declared that "Brown held squarely that law enforcement may not require a person to furnish identification if not reasonably suspected of any criminal conduct." 913 F.3d at 869 (internal citations omitted). "In short, Brown holds that an officer may not lawfully order a person to identify herself absent particularized suspicion that she has engaged, is engaging, or is about to engage in criminal activity, and Hiibel does not hold to the contrary." Id. Thus, it was clearly established by the date of the traffic stop in this case that the police could not require passengers detained during a traffic stop provide identification documents. Id.

The Court finds that it is undisputed that Nelson 'required' Iiams identification without any reasonable suspicion that Iiams had committed a crime, was about to commit a crime or was in the act of committing a crime. This finding has two components—a.) the lack of reasonable suspicion and b.) the demand for identification. First, it is undisputed that Nelson did not have any reasonable suspicion that Iiams (or any other passenger) had committed or was about to commit a crime. There is nothing in the record to establish such suspicion, and Defendants, including Nelson, do

not argue that there was reasonable suspicion. And the Court has previously disposed of the Defendants' argument that officer safety justified the checking of passenger ID's. See supra, Section V.a.i. The first component of the violation set forth by Brown is thus met here. 443 U.S. 52-53.

Second, the Court also finds that Nelson 'required' that the passenger ID's be provided before the passengers could be released from their investigatory detention in the van. The record, including camera footage, undisputedly establishes that Nelson demanded the ID's. He did not request consent or ask the passengers if they had any objection to their ID's being checked. He simply demanded: "start moving them up . . . ID's up front." This was not a request or a question. At the time of the request, the van had been pulled over and was blocked from leaving by the police. A uniformed and armed officer made this demand of the passengers who were clearly not free to leave until the officers decided that they could leave. The record thus also undisputedly establishes that Nelson unlawfully "required" the passengers to provide documentary identification prior to being released even though he had no reasonable suspicion of criminal activity of any passenger. Brown, 443 U.S. at 52-53.

The Court rejects the Defendants' argument that the demand or requirement for the provision of identification was not unlawful because Iiams was aware of his right to refuse to provide the identification. Defendants argue pursuant to Florida v. Bostick, 501 U.S. 429 (1991) that taking all factors into consideration Iiams was not seized and required to provide his identification in order to obtain his release. Id. at 437. This argument fails for a few reasons. First, the Court finds it undisputed that the van in which Iiams was a passenger in this case was pulled over for a traffic violation by a marked police car which used its police lights to force the van to pull into a parking lot. Once in the parking lot, Nelson pulled his car behind the van to prevent it

from leaving. It is well established that a passenger in a vehicle pulled over by show of authority is seized pursuant to the Fourth Amendment. <u>Brendlin v. California</u>, 551 U.S. 249, 256-58 (2007). Second, it has never been the case that Fourth Amendment jurisprudence requires a civilian to resist an unlawful seizure or law enforcement order to vindicate or vest one's claim against that same unlawful seizure or order. Defendants have identified no such authority and no authority exists for such a threshold requirement. It is undisputed that Nelson ordered Iiams along with the other passengers to submit their identification documents as part of the stop. It is also undisputed that van with the passengers was blocked initially by one marked vehicle and then subsequently by several. And when Iiams was ordered out of the van, his identification was not returned to him until the field interview was complete. These circumstances establish on undisputed facts that Iiams was required to provide identification documents as part of the traffic stop and was not free to leave until he had presented such documentation. Iiams' lack of resistance to this unlawful conduct even if he believed it was unlawful does not alter this determination of a constitutional violation.

Finally, the Court finds that Nelson is not entitled to qualified immunity on this claim. Nelson's order to Iiams to provide identification as part of the traffic stop even though Nelson had no reasonable suspicion that Iiams had committed a crime was unconstitutional. <u>Brown</u>, 443 U.S. at 52-53. Moreover, it was clearly established at the time of the stop in this case that it was unlawful for a police officer to require an individual to provide identification documents when that individual is not suspected of a crime. <u>Id.</u> Nelson is therefore not entitled to qualified immunity on this claim.

The Court grants summary judgment in favor of Plaintiff and against Nelson this claim. This claim shall proceed to trial for the purpose of determining damages only.

### c. Fourth Claim – Monell Claim Against Metro For Policy of Demanding Identification Documents From Nonsuspects In Stops

The Court denies summary judgment on Iiams' fourth claim, which is brought as a Monell policy or practice claim against LVMPD for unlawfully demanding identification documents of individuals who are not suspected of any crime.

Under Monell, when a municipal policy of some nature is the "driving force" behind an unconstitutional action taken by municipal employees, the municipality will be liable. Monell v. Dep't of Social Services, 436 U.S. 658 (1978). A municipality may be liable for injury under Section 1983 under three possible theories. "First, a local government may be liable if execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury. . . Second, a local government can fail to train employees in a manner that amounts to deliberate indifference to a constitutional right, such that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. . . Third, a local government may be held liable if the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." Rodriguez v. City of L.A., 891 F.3d 776, 802-03 (9th Cir. 2018) (internal citations omitted).

Iiams alleges that LVMPD has the following de facto or official practices or policies: 1) requiring credible and reliable identification beyond the declaration of a name; 2) using coercive language to make people surrender credible and reliable information; and 3) encouraging officers to gather intelligence on passengers in a vehicle without reasonable suspicion and run their IDs through law enforcement databases.

20

The Court finds that there are genuine issues of disputed fact as to this claim. The Court first finds that the record establishes that LVMPD may condone a de facto policy of its officers demanding identification from individuals who are detained pursuant to the demonstration of law enforcement authority but who are not suspected of any criminal activity. Specifically, LVMPD's 30(b)(6) witness, Kevin Barker, explicitly acknowledged that LVMPD permits officers to demand identification even when there is no reasonable suspicion:

> Q: "Would it be a violation of Metro policy in a consensual encounter for an officer to walk up to a citizen without reasonable suspicion or probable cause and say, "Do you have ID? I require you to give to me?"
> A: Those exact terms, is it a violation? Generally speaking, I mean honestly, again, we don't have a policy that frames it that way. We don't have a policy that says it's against Metro policy in a consensual encounter for an officer to go up and say, "Give me your ID. I demand it."

>            *       *       *       *       *       *       *

> Q:  Let me give you – let me give a different example then, or let me give more details to the example. Let's say a single officer pulls over a passenger van with 15 people –
> A: Okay
> Q: --and doesn't ask for backup for whatever reason. He obtains 15 ID's –
> A: Okay
> Q: --and then runs every ID before writing a ticket for the driver –
> A: Okay.
> Q: --would that be a violation of Metro policy?
> A: No.
> Q: Why not?
> A: So based on the way you phrased it, you said routine traffic stop, traffic – an officer pulls over a car with 15 people in it, and everybody gives up their IDs. He goes back, and he runs everybody before he does the citation. Is that a violation of Metro policy? My answer to you is no – well, first is that a clear rephrase of what you are asking?
> Q: I think so, yes.
> A: Okay. My answer is no. Here's the reason why: Based on that, my perception of the question is *nobody objected clearly to the officer's request, demand, approach, whatever for identification*. Somehow, he got these IDs. So it's okay for him to go back and run everybody, to wait and to the citation, and the returns may take longer. That is part of the routine of that traffic stop based on the context that you have given me. (emphasis added).

21

Barker also replied, "absolutely it's allowed" and that "it happens all the time" in response to a question about whether officers could direct a pedestrian to provide a driver's license in "a tone that might be perceived as more than a request." This evidence strongly suggests that LVMPD has an unconstitutional practice by its officers which is ratified by the Department of demanding identification from passengers in a vehicle even when there is no reasonable suspicion of criminal conduct for those respective passengers. However, the lack of sufficient undisputed facts to determine whether these statements reflect a policy or practice versus a Metro representative offering in response to a hypothetical question his interpretation of what would be legal or permitted creates a genuine issue of disputed fact as to the existence of such a policy. That is to say that the record is unclear as to whether there is an actual practice or policy which effectuates this unlawful interpretation by a single Metro representative. The Court will deny summary judgment on this claim and permit it to proceed to trial.

The Court again rejects LVMPD's argument that the line of demarcation for unconstitutional action is whether or not an individual, for whom there is no reasonable suspicion, refuses to provide identification and is then arrested for failing to provide such identification. As noted earlier in this order, this is clearly contrary to the law as set forth in Brown and confirmed in Landeros. Brown, 443 U.S. at 52-53; Landeros, 913 F.3d at 869. A custom or practice does not suddenly become unconstitutional when it is challenged by a knowledgeable citizen. Such an approach would permit police officers to continue to engage in an unlawful practice or custom by leveraging the authority of their position and the physical implied threat of force (by means of their visible weapons) only to be checked by a citizen brave enough to resist such a demonstration of authority. The Supreme Court has long recognized that "mere submission to a claim of lawful authority" by a police officer does not legally constitute voluntary consent to an otherwise

22

unlawful action of a police officer. <u>Kaupp v. Texas</u>, 538 U.S. 626, 631 (2003) (internal citations omitted).

## VI.    CONCLUSION

**IT IS ORDERED** that Defendant Las Vegas Metropolitan Police Department's Motion for Summary Judgment (ECF No. 47) is DENIED.

**IT IS FURTHER ORDERED** that Defendants Justin Byers, Jonathan Carrington, Lukas Ferris, and Richard Nelson's Motion for Summary Judgment (ECF No. 48) is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff James Iiams' Motion for Partial Summary Judgment (ECF No. 49) is GRANTED in part and DENIED in part. The Court grants summary judgment in Plaintiff's favor on Claim One against Defendants Nelson and Ferris. The Court grants summary judgment in Plaintiff's favor on Claim Two against Nelson. The case will proceed to trial on damages as to these claims. The remainder of Plaintiff's motion is denied. The case will proceed to trial also on the merits of the remaining claims.

**IT IS FURTHER ORDERED** that a status conference to set a trial date is set for **February 16, 2021 at 9:30 a.m** in LV Courtroom 7C by videoconference. (The instruction regarding this videoconference will be issued by the Court.)

**DATED**: <u>February 1, 2021</u>.

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

23